**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-172 (APM)** |
| **v.** | : | |
| | : | |
| **EDWARD AMYOT** | : | |
| | : | |
| **and** | : | |
| | : | |
| **DOMINIC JAKUBOWSKI,** | : | |
| | : | |
| **Defendants** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendants Edward Amyot and Dominic Jakubowski each to 3 months' incarceration and 12 months' supervised release. The government also requests that this Court impose 60 hours of community service, and consistent with the plea agreement in this case, $500 in restitution.

**I.    Introduction**

Defendants Edward Amyot, 36 years old, and Dominic Jakubowski, 23 years old, are two friends who participated together in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

Amyot and Jakubowski both pleaded guilty to violations of 18 U.S.C. § 1752(a)(2). The government's recommendation is supported by the defendants' contributions to violence against police officers on the West Plaza. Both men helped to push a large metal sign into a police line, and soon after, pushed the bodies of rioters standing directly in front of them into that same police line. Both defendants have minimized the seriousness of their actions and their roles in the physical confrontations with police, as shown in their post-plea interviews with the FBI.

The Court must also consider that the defendants' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of their crimes support a sentence of incarceration in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 29, 31.

### Amyot's and Jakubowski's roles in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Amyot and Jakubowski traveled to Washington D.C. from Michigan to attend the former President's "Stop the Steal" rally by the Ellipse.  At some point after arriving in D.C., Amyot and Jakubowski made their way to the U.S. Capitol, where they joined the early

---

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

wave of rioters gathering around the security perimeter—approximately in the area near Garfield Circle and the Ulysses S. Grant Memorial. Amyot wore a black windbreaker, khaki pants, a newsboy-style hat, and a red, white, and blue graphic gaiter. Jakubowski wore a black and white skeleton mask, dark sunglasses, a dark jacket, blue jeans, and a green baseball cap. *See* Images 1–3.



*Image 1 (defendant Amyot on January 6, 2021)*



*Image 2 (defendant Jakubowski – mask)*



*Image 3 (defendant Jakubowski – no mask)*

From there, Amyot, Jakubowski, and others in this early wave of west front rioters began breaching Capitol Police barricades around the security perimeter. Jakubowski ripped away a line of police tape as he, Amyot, and others moved across the Capitol's west lawn and advanced toward the Capitol building. Amyot—as he and Jakubowski passed the breached barriers, area closed signs, and fencing—carried a flag pole. As Amyot and Jakubowski reached an interior perimeter of snow fencing on the lawn area, Jakubowski grabbed and shook a metal fence post. At some point, Amyot began filming the growing chaos using his phone.

As Amyot and Jakubowski entered and remained on Capitol grounds, Jakubowski recorded a series of Snapchat "stories." The stories show that, at approximately 1:05 p.m., Jakubowski and Amyot made it to the West Plaza, near the media tower. In one video, Jakubowski yells, "we stormed the Capitol—let's go!" Exhibit 1[2] at 00:19. At one point, Jakubowski turns the camera toward himself, showing his attire and the mob around him. *Id.* at 00:38.

By approximately 1:40 p.m., a contingency of police officers was fighting desperately to maintain a police line on the West Plaza, specifically near the media tower where Amyot and Jakubowski were present. As the police worked to fend off repeated attempts by rioters in the still-growing crowd to breach the police line and assault officers, rioters moved a large "TRUMP" sign towards the police line. The sign was encased in a thick, metal frame, approximately eight feet tall and ten feet wide, welded with screws, and supported by large casters the size of a man's head. Jakubowski and Amyot briefly helped guide the sign over the heads of rioters toward the front of the mob. *See* Image 4; Exhibit 2 at 00:08.

---

[2] All referenced video exhibits will be provided separately to the Court and the defense.



*Image 4 (Amyot circled in green, Jakubowski in red)*

Rioters at the very front of the mob then shoved the metal sign frame into the police line like a massive battering ram. As the police were struck by the sign, they easily could have been knocked over due to the frame's sheer size, and the sharp edges and corners were readily capable of causing slicing or splitting injuries. The police worked quickly to pull the sign away from the mob. It ultimately took over a dozen officers to fully move the sign away from the line.

Meanwhile, rioters began collectively and purposefully pushing each other into the now-vulnerable police line. Amyot and Jakubowski joined this effort—Jakubowski with both hands planted firmly on the rioter in front of him, shoving forcefully, and Amyot pushing forward with one arm as he continued to film the chaos with his phone in his other hand. Exhibit 3 at 00:03; Exhibit 4 at 00:41.  In pushing together with the crowd, Amyot and Jakubowski advanced to an area essentially directly against the police line, where they supported still-pushing rioters until the police were forced to deploy chemical spray against the mob.  As the police sprayed the crowd, Amyot and Jakubowski scrambled away from the mob's front line. *See* Image 5 and 6.



*Image 5 (Amyot circled in green, Jakubowski in red)*



*Image 6 (Amyot circled in green, Jakubowski in red)*

Afterward, Amyot and Jakubowski remained on Capitol grounds for at least another two hours—staying on the West Plaza and near the areas where rioters finally succeeding in breaching

the police line and the mob surged onto the Inaugural Stage and the Lower and Upper West Terraces. *See* Image 7.



*Image 7 (both Amyot and Jakubowski in red box)*

Indeed, Jakubowski's Snapchat stories from the day end with a still photo of the Capitol—now completely overrun by the massive mob of rioters—with the triumphant words "I did this" written across the middle. *See* Image 8; Exhibit 1 at 00:56.



*Image 8*

*Amyot's Post-Plea Interview with the FBI*

As part of his plea agreement, Amyot agreed to sit for an interview with the FBI regarding the events of January 6, 2021. The interview was held virtually on June 14, 2024. Amyot explained that he and Jakubowski flew to D.C. together with another individual on January 6, 2021, to see former President Trump give a speech at the U.S. Capitol building around noon or 1:00 p.m. Amyot claimed he understood that the former President's speech was going to be about "getting them in 2024." Amyot recalled that Trump's speech had already begun when he and Jakubowski arrived in D.C., so they made their way to the Capitol.

According to Amyot, the atmosphere at the Capitol was cordial but grew "dark" as more people arrived and the streets became crowded. Amyot recalled Capitol Police officers approaching the west front crowd prior to the breach and telling the crowd to move back, but "all of a sudden" members of the crowd began to breach the barricades. Amyot claimed he was pushed onto the Capitol's west lawn by "hundreds" of people behind him.

Amyot recognized that the scene on the West Plaza was "chaos." He claimed he stopped some "kids" from throwing items at police officers and the crowd was getting riled up by a man with a bullhorn on the media tower. Amyot recounted filming video on his phone with a handheld video recorder. He wanted to use the footage for a podcast he used to host. According to Amyot, his phone broke at some point after January 6, 2021. Amyot endeavored to find the footage he shot with the handheld camera and provide it to the government, but the government never received any footage. Amyot recalled that the metal sign frame hit his head from behind and he put up the back of his hand to touch the sign.[3] Amyot claimed he did not push the sign forward and did not mention assisting the crowd push into the police line behind the sign.

*Jakuboski's Post-Plea Interview with the FBI*

Jakubowski also, as part of his plea agreement, agreed to sit for an interview with the FBI regarding the events of January 6, 2021. The interview was held virtually on June 20, 2024. Jakubowski recalled that he and Amyot arrived in D.C. when the former President's speech had already begun. Jakubowski claimed he and Amyot moved toward the Capitol because they expected the former President to give another speech there.

---

[3] Video footage of the incident shows the metal sign frame came from Amyot's right. It also shows him briefly grasping the edge of the sign. Exhibit 2; Exhibit 4.

According to Jakubowski, some people in the crowd at the Capitol started jumping the barriers onto the Capitol lawn, so he thought he and Amyot should do the same. Jakubowski recounted "moving" some caution tape and plastic fencing as he entered the grounds because he was afraid of getting trapped by the people behind him. He also recalled things getting "crazy" at this point.

Jakubowski claimed he assumed the fencing around the media tower was the "VIP" section for the former President's anticipated speech. Jakubowski saw officers arrest a rioter at one point. He also claimed to have assisted rioters suffering from chemical spray using a medical bag he brought with him to the Capitol.

Jakubowski recalled when the large sign with a metal frame was passed through the crowd and rammed into the police line. Jakubowski felt like the only thing he could do was push the sign "away from people." Jakubowski remembered pushing people in front of him during this incident, but claimed the pushing, "just happened" because of "the atmosphere." Jakubowski did not think the crowd moving the sign was violent. Indeed, Jakubowski asserted that he did not realize the situation was "illegal" until the police line broke. Nevertheless, Jakubowski acknowledged remaining on Capitol grounds as long as he did because he was "witnessing history." Jakubowski indicated he regrets his actions on January 6 because of the effects the event has had on his life.

*The Charges and Plea Agreement*

On April 8, 2024, the United States charged Amyot and Jakubowski by a one-count Information with violating 18 U.S.C. 1752(a)(2). On April 15, 2024, pursuant to a plea agreement, Amyot and Jakubowksi both pleaded guilty to the Information. By plea agreement, both defendants agreed to pay $500 each in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Amyot and Jakubowski now face sentencing for violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, both defendants each face up to 1 year of imprisonment and a fine of up to $100,000. The defendants must also pay restitution under the terms of their plea agreements. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

As described below, the government does not agree with Probation that Amyot and Jakubowski are eligible for a 2-level decrease under U.S.S.G §4C1.1. Beyond that, the government agrees with the Sentencing Guidelines calculation set forth in the PSR, which comports with the parties' agreed-to guidelines calculation:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | +10 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 8 |

*See* Jakubowski PSR ¶¶ 41–47; Amyot PSR ¶ 43–49.

The U.S. Probation Office calculated both Amyot's and Jakubowski's criminal histories as a category I. Amyot PSR ¶ 54; Jakubowski PSR ¶ 52. Accordingly, the U.S. Probation Office calculated both defendants' total adjusted offense level, after acceptance and an adjustment pursuant to §4C1.1, at level 6 and their corresponding Guidelines imprisonment range at 0-6 months. Amyot PSR ¶ 97; Jakubowski PSR ¶ 103.

U.S.S.G. §4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. The defendants' pleas reserve the parties' rights to argue over the applicability of §4C1.1. Section 4C1.1 does not apply in this case because of the defendants'—under the totality of circumstances—use of violence against the officers attempting to hold the mob back on the Capitol's West Plaza.  Other judges in this district have defined "violence" as the "exertion of any physical force so as to injure or abuse" or "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5; *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting the definition of violence from *Bauer*). Here, as described above, Amyot and Jakubowski's joined a concerted effort to physically push the rioters in front of them—in connection with the use of the "TRUMP" sign battering-ram—into the police line.  If the "fury, vehemence, or outrage" of the defendants' actions does not speak for itself, it is clear when viewed in its proper context—it did not "just happen" because of "the atmosphere," as Jakubowski claimed in his post-plea interview. The plain goal of this physical effort was to breach the police line and overrun the officers—regardless of the police's safety or possible injury. Overall, Amyot and Jakubowski directly supported and contributed to the violent assaults between police and rioters at the front of the mob. They could see these assaults happening in front of them, and their efforts

to help break the line only waivered once the police were forced to deploy chemical sprays against the mob. And even if the Court disagreed that this conduct constituted direct violence, it is at the very least a credible threat of violence: a believable expression of Amyot's and Jakubowski's intent to use physical force to inflict harm. *See, e.g.*, *United States v. Heather Kepley*, 23-cr-162 (BAH) (declining to apply §4C1.1 on § 1752(a)(1) conviction because defendant's presence during the mob's heave-ho constituted a credible threat of violence under § 4C1.1); *see also United States v. Giberson*, 23-cr-115 (CJN) (participation in coordinated pushing against police on 18 U.S.C. § 231 conviction).

Moreover, due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that §4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply §4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether §4C1.1 applies.[4] Though, in any event, the defendants' guidelines ranges remain the same (0-6 months) whether the two-level decrease from offense level 8 to 6 applies or not.

---

[4] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 3 months' incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).

One of the most important factors in Amyot's and Jakubowski's case is their continued denial of their early and extensive role in the riot on the West Plaza. Both defendants, in their post-plea interviews, attempted to minimize their actions and roles that day—preferring to deny what video evidence directly contradicts or wave off their participation in and contribution to the day's violence.

14

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B. Amyot and Jakubowski's History and Characteristics**

As set forth in the PSR, Amyot's criminal history consists of a single "Operating Impaired" conviction from 2009, for which he was sentenced to a fine of $810 or "30 Optional Jail Days[.]" Amyot PSR ¶ 53. Amyot also reported running a successful business and being a volunteer firefighter. His assets total $740,714.

Jakubowski has no criminal convictions. He reported holding specialize training and certifications in quality engineering and works as a full-time contract engineer. Jakubowski also noted he operates a business buying and selling firearms. The website for his business describes Jakubowski as "a collector of firearms, mainly imported military-style firearms." Jakubowski PSR ¶ 80. Jakubowski is an owner of two other businesses, and his assets total $467,761.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

**D. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to these particular defendants also weighs heavily in favor of a term of incarceration.

While both defendants have accepted responsibility by resolving their cases through guilty pleas, their January 6 conduct and post-plea statements are troubling. Neither defendant took any steps to denounce their egregious actions on January 6, 2021. Amyot indicated to the Probation Office that he regrets the effects of this case on his life, but he does not meaningfully engage with the causes behind or specifics of his conduct. Instead, Amyot attributes his criminal conduct to "los[ing] control of [him]self." Amyot PSR ¶ 41.  Likewise, Jakubowski simply conceded during his FBI interview that what happened on January 6 was "not something good." And when confronted with his statement on the day—"I did this"—Jakubowski claimed he was referring to

protesting. Given this consistent minimization of their conduct, the Court should view any remorse Amyot and/or Jakubowski express at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Amyot and Jakubowski did not accept the results of the 2020 presidential election, so on January 6 they prepared for a fight, invaded the Capitol grounds, and contributed to the violence against police. With the 2024 presidential election approaching, a rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Amyot and Jakubowski in a manner sufficient to deter them specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors to assault on police officers.[5] This Court must sentence Amyot and Jakubowski based on each defendant's

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.

Amyot and Jakubowski have both pleaded guilty to the Information, charging them each with Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Matthew Baggott*, No. 21-cr-411 (APM), the defendant pleaded guilty to violating 18 U.S.C. § 1752(a)(2). Baggott, like Amyot and Jakubowski, had ample opportunity behold and disregard the chaos on the Capitol's west front before committing the crux of his criminal conduct. Like Amyot and Jakubowski, Baggott witnessed increasing chaos and violence against officers on the Capitol's west front. Just as Amyot and Jakubowski joined the first wave of rioters to storm the West Plaza, Baggott joined the first wave of rioters to breach the Senate Wing Door. And similar to Amyot's and Jakubowski's coordinated push against the police, Baggott interfered with officers: he threw an object at a group of officers and grabbed at a police baton. Unlike Baggott, Amyot and Jakubowski's conduct was more plainly coordinated and violent toward a particular police line—and earlier in the timeline of the riot. However, unlike

Amyot and Jakubowski, Baggott entered the Capitol building. This Court sentenced Baggott to three months' incarceration, and it should do the same for Amyot and Jakubowski.

In *United States v. Robert Reeder*, No. 21-cr-166 (TFH), the defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), but the government subsequently found video evidence of the defendant grabbing and pulling on a U.S. Capitol Police officer. Judge Hogan sentenced Reeder to three months of incarceration. Like Amyot and Jakubowski, Reeder engaged in aggressive conduct, and the Court in Reeder ultimately imposed a stiff sentence on misdemeanor charges. This Court should do the same here. Although Amyot and Jakubowski did not directly assault officers, their sentences must reflect that they nevertheless in engaged in physical, violent, and targeted conduct designed to support and perpetuate the direct assaults that occurred right in front of them.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that both Amyot and Jakubowski must each pay $500 in restitution, which reflects in part the role they played in the riot on January 6.[7] As the plea agreements reflect, the riot at the United States Capitol caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Amyot's and Jakubowski's restitution payments must be made to the Clerk of

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* Amyot PSR ¶ 117; Jakubowski PSR ¶ 123.

## VII.    Fine

The defendants' convictions for violations of 18 U.S.C. § 1752(a)(2) subject them each to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider each defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendants to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendants have both not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is either: (1) under level 8, $2,000 to $20,000, or (2) under level 6, $1,000 to $9,500. U.S.S.G. § 5E1.2(c).

## VIII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence defendants Edward Amyot and Dominic Jakubowski each to 3 months' incarceration, 12 months' supervised release, 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. Such

a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on the defendants' liberty as a consequence of their behavior, while recognizing their acceptance of responsibility for their crimes.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759